Good morning, may it please the court. My name is Rebecca Pannell, representing Gerardo Rios-Orozco. This case presents the important question of when a criminal defendant can present his side of events to a jury. Mr. Rios-Orozco was not given the opportunity in this case, and that is the crux of the majority of the appeal. I wanted to start with discussing the necessity defense that was proffered because I think it raises an important issue that this court has not yet decided. In Ortiz-Villegas, this court recognized that it wasn't deciding when the crime of returning to the United States ends if an alien crosses through a border checkpoint and is not deceptive in terms of his ID. And that's what we proffered in this case, and Judge Nielsen accepted that proffer that Mr. Rios-Orozco gave his true ID when he crossed over the border. So when does the crime of being found in the United States end at that point in time? Both the Third Circuit and the Eighth Circuit have said it ends basically at the moment that he is beyond their control. Once the immigration authorities know of somebody's unrestrained presence in the United States, the offense ends. The offense is being found in the United States after deportation, not being arrested in the United States after deportation, not merely remaining in the United States after deportation. And if at the moment that he was taken away in an ambulance unrestrained by immigration authorities, they knew he was there, they knew his ID, they knew of his unrestrained presence in the United States, the crime was complete at that point. He could not have escaped liability by returning to Mexico. This court has repeatedly said that an individual who can escape liability for being found in the United States after deportation, if they return prior to detection by the authorities. Here, had the authorities decided, oh, we made a mistake, we want to prosecute him, clearly they could have... How long does the necessity continue then? Under your version, it continues for the rest of his life? No, it continues for the extent of the offense. And so in this case, it's a short defense. He was convicted of being found in the United States, right? Correct. So anytime he's in the United States after coming in, wouldn't he be found in the United States? No. I think if the statute were worded differently, if it were worded as some statutes are, there's a Cruman statute that Di Santillo case talks about. There's a Cruman statute that talks about people remaining in the United States past their authorization, and that's very different from being found in. Found in occurs at one moment in time. Remaining in can occur indefinitely. When you're found, your presence is known to the immigration authorities either actually or should be known through due diligence. The same test the Eighth Circuit said should apply to a civil plaintiff. And that's at one moment in time. It's a continuing offense, and for many people that may span years and years. But once you're found, you're found. When do you contend that he was found? He was found the moment that he was free from official restraint. So like I said in the briefing, it was essentially coterminous. As Judge Fernandez has written, the crime of being found in and the crime of entering the United States are along a spectrum. Entering the United States is embedded in being found in the United States. And in this case, it happened along a spectrum. And that's what distinguishes this case, an important distinction between this case and the Pena-Hyman case. I'm not sure you understood your answer. If there's a particular point, when was he found, illegally found in the United States? Was it when he left the hospital the next day? I would say before then, when he was being taken away in the ambulance. Because unlike what has happened in other cases, they didn't. So help me, could he have offended them any time after that under your version? Not for being found in. If the statute had been written differently, because being found is when the immigration authorities find you. If the statute said remains in the United States after entry, it would be a different circumstance. But after he's arrested for this robbery and the information comes to the probation department, he can't be found then? You can't be found multiple times. And a case that wasn't cited in the brief, I can certainly provide supplemental authority. This court has just— Is there any record evidence that he told the person at the border that he had earlier been deported? There's not evidence of that. That raises another question of what information do you need to provide. The Eighth Circuit has clearly said you just need to provide your identification. Then once the immigration authorities receive that information, then they're obliged to not be negligent in determining whether or not a person is here illegally. I think that in terms of whether or not— the other question in this case, the entrapment by estoppel, goes to similar issues of how much information do you need to provide. So tell me, how is the necessity defense supposed to work under your theory? The necessity defense, I think we've proffered very clear facts that the situation was urgent when he reached the border. It was different from the AIDS case, different from the diabetes case that was brought. It was an urgent situation where he needed immediate care, and there weren't other reasonable alternatives than getting to a hospital in the United States. That was the necessity at that moment. So that's the necessity for entering? For entering at that moment. But because the fence ended so quickly— It's also a necessity to have been found in the United States. Right. So that's the theory? The theory is the offense didn't last very long, and it's simply a different offense, one that doesn't exist, to remain in the United States. So in order to protect himself, to get the medical care, he had to not only enter, but be found in the United States. Well, they could have—I mean, the immigration authorities could have handled things very differently. No, no, no. I mean, because he's charged and convicted with having been found in the United States. Sure. And he would have presented evidence— I'm just trying to take your theory and take it to the logical conclusion, which is that he had to have entered as a result of a medical necessity. Correct. I mean, necessarily, not to be—you know, play on words, but he had to have been found in the United—he had to be found in the United States in order to avoid any harm. And that—well, the necessity continued— That doesn't make any sense to me, but that's your theory. Well, the necessity continued until—through the duration of the offense conduct. And this court, the way the court has construed the statute, is that the offense conduct continues until immigration authorities become aware of the unrestrained presence in the United States. You don't get to find an alien multiple times, and if the alien is not detected, the alien can return to Mexico or to a different country without liability. In this case, it would certainly make no sense to say that had Mr. Rios Orozco decided to return to Mexico prior to being caught with the bank robbery, that if some officials in California at that point had decided, oh, we made a mistake, that they couldn't indict him. That would be the result of the court's ruling. I don't think that that is correct either. I think the court's frustration is the way the statute is worded. It says found, not remains. So you're saying there's no limit on the necessity either? In this particular case, in this particular case, because the necessity lasted throughout the duration— He wasn't under. He was released the day following. He was released from immigration authorities when he was put in the ambulance because they did not send a police escort or have him under any sort of control at that point in time. Necessity, doesn't that also require that there, you know, be no other— Reasonable alternatives. And I think we've profited enough, at least for a jury, of whether or not, when he came to the border, whether or not there were no other reasonable alternatives.  Whether there were sufficient facts proffered for a jury to hear. That doesn't mean we'll win. But for a jury to hear, at the very least. I've only discussed one issue, and I have a minute-fifty remaining. Perhaps I could take the rest for rebuttal. That's fine. Thank you. May it please the Court. My name is Allison Greggwire, and I represent the United States in this matter. I'm going to focus my efforts on Assignment of Error No. 2, given that that was what was just discussed. If the Court feels that my efforts need to be redirected, I trust the Court will mention so. I would note that for a defendant to prevail, as he notes in the first line of his reply brief, on Assignment of Error No. 1, there has to be a viable defense in Assignment of Error No. 2. The government asserts that the district court was correct in finding that the defendant had failed to make a prima facie case as to either the defense of entrapment by estoppel or the defense of necessity. Turning first to entrapment by estoppel, there are five things that a defendant must show. The government argues that the defendant established a case as to none of those things. First, the defendant has to show that the agent was made aware of all relevant facts. In this case, there is no argument that the agent was not made aware that the defendant had been deported ever, let alone that the defendant had been deported eight times. Courts that have spoken to this point have noted that that is essential information. Specifically, the government would cite to Trevino-Martinez out of the Fifth Circuit, Gutierrez-Gonzalez out of the Tenth, and Martis out of the Second, all of which reiterate how important this information is. Specifically in Trevino-Martinez, the Court noted no entrapment by estoppel, where Trevino was not candid about his previous arrests and deportations because without that material information, the consulate would be unaware that Trevino was required to have the permission of the Attorney General to seek an application. Also, moving on to an affirmative representation, and this Court has gone back to this in several cases, just how important this is, an affirmative representation that the conduct in question was permissible, and that is lacking in this case. And this is something I wanted to clarify because I'm not sure if I made it clear in my brief. There was no declaration submitted by a defendant in support of his version of events for this motion. There was no affidavit. A defendant didn't take the stand for the limited purpose of the motion. So when I talk about defendants per offer, I'm referring to the unsworn assertions by trial defense counsel in her briefing. Well, there was the notation from the ambulance service. That's correct, Your Honor. Something happened at the border. Inarguably, yes. You're right, Your Honor. It seems to be pretty clear that he was transported from the border to the hospital for medical care. Right. That's right, Your Honor. That seems to be undisputed. Yeah. The government does not dispute that. That's correct. But insofar as defendant making further representations to make sure that the agent had all the relevant information, that is lacking, and specifically as to his prior deportations. But additionally, what the agent said, that is also lacking. Defendant never at any point, even in briefing or during argument through trial defense counsel, submits that the agent told him that what he was doing, that his conduct was legal, that he was going to be legally admitted into the United States. And that's important. This Court, I would look to United States v. Brevner, this Court's decision, where Brevner was permitted by a federal licensee, by a firearms dealer, to buy a firearm. And he had told the firearms dealer about his prior conviction. And this Court noted that perhaps the firearms dealer had a duty to inquire further. Perhaps he shirked that duty. But still, Brevner could not benefit from entrapment by estoppel because he was lacking an affirmative statement that his conduct was legal. Similarly, in Ramirez, Valencia, I bring that up because that is a 1326 case, where defendant received that I-294 when he was deported, saying it's illegal for you to return for five years. And he sought to rely on entrapment by estoppel that the inverse must be true. If you come back after five years, you're fine. And this Court held to succeed on a theory of entrapment by estoppel. A defendant must show that the government made, must show more than that the government made vague or even contradictory statements. The defendant must show the government affirmatively told him the conduct was permissible. And that's lacking in this case. Then quickly, just whether or not defendant reasonably relied on this advice. The District Court was in a unique position, in that defendant's statement was submitted to the District Court, so the District Court knows the defendant did not rely on this advice. In that statement, which is at Excerpt of Record 125, defendant admits when he's asked if he's illegally in the country, he says yes he is. When asked if he had the permission of the Attorney General, he says he did not. And that was, again, unrebutted evidence in front of the District Court. Given defendant's immigration history, the government would also submit any reliance would have been unreasonable. As to whether or not Border Patrol agents are authorized individuals to dole out this sort of advice, the case law that's cited in our brief shows that the cases, the courts that have ruled on this subject says that they are not. However, the government asserts this Court need not reach that question because defendant has failed to make out a case as to the earlier points. As to the defense of necessity, there is a 1326 case that, well, there are two, but there's one that talks about necessity in a 1326 context, cited in both briefs, and that's Aureliano Rivera. And in that case, defendant had an advanced case of AIDS, and he was seeking treatment that was only available in the United States. And this Court said that there could be no necessity because there were legal alternatives to violating the law, namely that defendant could have sought a parole from the Attorney General, could have sought temporary admission to deal with his medical condition. And then they were faced with Aureliano Rivera's response that such a parole would never be granted to someone in his position. And this Court responded, Aureliano Rivera's speculation, however likely, that the Attorney General would not deport or, excuse me, would not parole a previously deported felon back into the United States on the basis of his advanced case of AIDS, in no way negates the application process as a viable legal alternative. What is that process? To petition the Attorney General for parole. Where? Where would that occur? I honestly don't know, Your Honor. I assume that it would occur at a consulate. It would be pretty hard to get a response within, what, 10 minutes, 20 minutes? I think it would be hard to get a response within 10 minutes. Ten days? I don't know how long it takes, Your Honor. I assume that it could be expedited for emergency circumstances. But additionally, in terms of the exigency of defendants' particular circumstances, what were submitted is what was alluded to earlier, the reports by the ambulance, et cetera, where a defendant says that his pain was a 6 on a scale of 1 to 10 and that he had persistent pain in his foot. And the government's aware that the defendant ultimately had multiple surgeries to his leg. That's very much aware of that. But in terms of the urgency, I'm not sure the defendant fleshed that out very well before the district court. Well, somebody must have thought it was an emergency. They called an ambulance. Right. But an ambulance was also called in the Perdomo Espana case, 9th Circuit, 2008. An ambulance was also called for, in that case, a diabetes response. And the court still ultimately held that that defendant could not benefit from a defense of necessity in that case. So I don't know that an ambulance is dispositive as to that question. More of an emergency situation. Right. No, I think that that's true. I think, though, also, in Arleano-Rivera, the urgency wasn't discussed as ‑‑ it was more just discussed as in terms of a viable legal alternative. And I don't know that, again, the facts have been presented that would show that the defendant's case was much more urgent than an advanced case of AIDS. I know you don't want to, but I don't know why somebody at the secondary inspection or at the border that wouldn't have some authority to decide to let somebody into the country on a parole or something, some situation. And there may be, sir. I'm just not privy to that. If there is, that was not sought in this case. The defendant was not technically ‑‑ They felt he needed medical care. That's correct. Yes. And he was brought in to receive medical care. In terms of the necessity and the expanding necessity, there is no case law to support that this offense terminated at the border. A 1326 is a continuing offense. Defendant ‑‑ Do you disagree with her argument that there's case law that says that you can only be found once, or it's a one‑time kind of event? The case law the defendant cites, too, those are statute of limitations cases. There's no statute of limitations issue in this case. Further still, there's statute of limitations cases that this court has never adopted from other circuits. Further still, those statute of limitations cases applied once in the case of De Santillo, where he had applied for a visa and had a full INS interview, so they had all that information about the defendant. And in the second case, Gomez, where they had the defendant's fingerprint, and anyone who works in immigration cases knows how important those fingerprints are, as did the court, and said they were going to run the statute of limitations from the time they could have had that fingerprint back from the FBI data search. So in both those cases, they're factually distinguishable because they had far more evidence than just the defendant's name and date of birth. Additionally, there's statute of limitations cases that certainly don't support that any defense would run only for the instant period of crossing the border. Rather, they say that's when the statute of limitations commences. Okay. I see I'm out of time. Thank you. Thank you, Kelsey. Just briefly, the question of when the offense ends I don't think differs if it's a statute of limitations issue or what have you. This court has applied the same test, for example, in the sentencing context in determining what guidelines apply as in the statute of limitations context. It simply never works well when there's different tests for the same legal question in different contexts. So I certainly would urge the court not to adopt that approach. There is an en banc opinion from this court that we've cited, United States v. Gracidas Ulibarri, which says at least at times border patrol agents can grant readmission to deported persons. And because of that, a defendant who merely approaches the border cannot be convicted of attempted illegal reentry of specific offense crime because it's questionable whether or not there was an intent to reenter without permission. So border patrol agents are not stripped of that sort of enforcement power. They're very akin to federal firearms licensees. There simply are no cases that say that a defendant who provide all pertinent information, whether it is for being found in the United States or for purposes of entrapment by estoppel, saying that a defendant must proffer his immigration history. The cases say if the person is deceptive, then they don't get the benefit. But if they're not deceptive and they provide their true ID... In this case, his true ID was also shared by somebody else that the government ultimately served. You know, they served some other detainee. Right, right. There was confusion later on with respect to his true ID. Just if he gives the name, should that be sufficient to... His name and his date of birth he gave. And I think also it's a jury question as well. And it goes to the frustration in this case also with the time that passed and the question regarding the speedy trial violation. If we had access to the people who talked to him, we might have a better idea of what was said and what was done, whether or not they got more information or not. If there's any doubt about whether or not there was a defense raised in this case, then it's our position that we prevail on the speedy trial question. Okay. Thank you.  Appreciate your arguments, counsel. The matter is submitted.
judges: Gwin, Fernandez, Paez